IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BRENDA M. GRIEGO,

       **Plaintiff,**

vs.                                                                  No.  03cv0820 DJS

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Griego's) Motion to Reverse or Remand For a Rehearing **[Doc. No. 12]**, filed on January 6, 2004, and fully briefed on March 30, 2004.  On March 10, 2003, the Commissioner of Social Security issued a final decision denying Griego's claim for disability insurance benefits and supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is not well taken and will be DENIED.

### I.  Factual and Procedural Background

Griego, now thirty-six years old, filed her application for disability insurance benefits on May 23, 2001 and her application for supplemental security income benefits on April 24, 2001, alleging disability since February 1, 2000, due to two herniated discs of her lumbar spine, chronic low back pain and left leg pain, depression, and anxiety.  Tr. 12.  Griego has a high school education and past relevant work as a casino dealer, a supervisory dealer at a casino, a cashier, a receptionist, and a developmental technician for disabled people.  *Id*.  On March 10, 2003, the

ALJ denied benefits, finding Griego had "'severe' impairments consisting of disc bulges without stenosis of her cervical spine; degenerative disc disease at two levels if her lumbar spine with a mild disc herniation at L5-S1 level without stenosis; myofascial pain, and an anxiety disorder with agoraphobia during the time periods at issue herein." Tr. 13. However, the ALJ found these impairments "did not meet or equal the pertinent sections set forth in the Listing of Impairments at Appendix 1, Subpart P of the Regulations." Tr. 14. The ALJ further found Griego retained the residual functional capacity (RFC) for "a limited range of light work in that she can lift and or carry up to 20 pounds occasionally and 10 pounds frequently; she can sit for six hours during a regular eight-hour work day; she can occasionally stoop, climb and bend; but, she cannot stand and or walk for prolonged time periods. Moreover, I find that she requires work environments which are not highly stressful." Tr. 19. As to her credibility, the ALJ found Griego's subjective complaints not totally credible. Tr. 21. Griego filed a Request for Review of the decision by the Appeals Council. On May 30, 2003, the Appeals Council denied Griego's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Griego seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience.  *Id.*

In support of her motion to reverse, Griego makes the following arguments: (1) the ALJ's finding that her depression was not severe at step two of the sequential evaluation process is contrary to the evidence and the law; (2) the ALJ's RFC finding is contrary to the evidence and the law; and (3) the ALJ's credibility finding is contrary to the evidence and the law.

**A.  ALJ's Finding of Depression as "Not Severe" at Step Two**

At step two of the sequential evaluation process, the ALJ must determine whether a claimant has a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment is considered "not severe" if it does not significantly limit a claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a).  The claimant bears the burden to demonstrate, at step two, that  an impairment or combination of impairments significantly limits her ability to do basic work activities.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  Basic work activities are "abilities and aptitudes necessary to do most jobs," and include the ability to understand, remember, and carry out simple instructions; to use judgment; to respond appropriately to supervisors, co-workers, and usual

work situations; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b)(3)-(6), 416.921(b)(3)-(6). A claimant "must show more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997). The step two severity determination "is based on medical factors alone, and . . . does not include consideration of such vocational factors as age, education, and work experience." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cr. 1988); 20 C.F.R. § 404.1520(c).

Griego contends that, at step two, she "must show only that the depression has more than a minimal effect on her ability to do basic work activities." Pl.'s Mem. in Supp. at 5. Griego contends the ALJ erred in finding, at step two of the sequential evaluation process, that her depression was not severe. *Id.* at 3. Griego claims the ALJ's statement that there were "no mental health counseling notes or medical records from a treating psychologist or a treating psychiatrist in the file" is unsupported by the evidence. *Id.* Griego further argues that "the fact that the treating doctors prescribed anti-anxiety and anti-depressants is also evidence supporting a step two finding of severity." *Id.* at 5.

In his decision, the ALJ found:

Although the claimant alleges disability due to depression, this psychological disorder has not been diagnosed for any consecutive 12-month period at issue in this case (Exhbits 12F and 14F). In fact, the claimant reported she has had anxiety with panic attacks which she referred to as "nerve" problems. But, she denied having any other "psychiatric problems" in November 2001 (Exhibit 18F, p.22). But, she did not mention depression or any other psychological problems (Exhibit 18F, p.22). In fact, in November 2001, she denied having any depression or feeling as if she was "down in the dumps" to Dr. Santos (Exhibit 18F, p.4).

Moreover, Mr. Martone did not submit medical records from Dr. Therese Hidalgo, who was treating the claimant for her anxiety (Exhibit 9E, p.2). I, therefore, find the claimant does not have "severe" depression in this case.

\* \* \* \* \* \* \* \*

As stated above, the claimant was working at a casino as of April 2001. She did not inform Dr. Benson that she had any difficulties working due to depression or anxiety (Exhibit 9F, p.2). In fact, the claimant had no complaints about the work environment and "enjoyed working with other staff members." The claimant did not mention any problems with anxiety or depression. And, as noted above, she had quit working at this job due to transportation problems. Also, the claimant worked another job, and she had not reported difficulties working with other employees. I reiterate that she was fired from this job because of a lack of work.

In October 2001, a state agency doctor noted that the claimant's panic disorder was more than "nonsevere" in nature. But, her anxiety and depression resulted from her "marriage dysfunction." Subsequently, in November 2001, the claimant stated she had "nerve" problems. She denied having any other type of mental or psychological disorder (Exhibit 12F).

In March 2002, a state agency doctor had reviewed the medical record to date. Although this doctor thought the claimant had "significant" cognitive impairment, there is no underlying medical documentation to support this finding. Also, this doctor stated the claimant had ony a "brief" history of a panic disorder, adding that her <u>concentration was intact</u> during employment interviews. And, this doctor <u>did not think she had any difficulty relating to others in social settings or with authority figures</u>. It was concluded that the claimant <u>could work with persistence and pace in competitive work settings</u> (Exhibit 11F).

During that same month, another state agency doctor completed a "Psychiatric Review Technique Form," stating that the claimant had an anxiety disorder or, more specifically, a panic disorder with agoraphobia.[1] Yet, this doctor determined that she had only "<u>mild" limitations of function with her daily living activities, social functioning, and her ability to concentrate and persist at work tasks</u> (Exhibit 12F).

The medical record shows that the claimant had been prescribed various antidepressant medications and antianxiety medications (Exhibit 9E, 13F, 14F, ad 18F). However, as stated above, there are no mental health counseling notes or medical records from a treating psychologist or a treating psychiatrist in the file. Further, there is no indication that the claimant was ever hospitalized for psychological disorders. Thus, I seriously question the claimant's allegation of "severe" anxiety attacks with agoraphobia. And, I reiterate that Dr. Morgan did not diagnose agoraphobia.

In April 2001, Dr. C. Morgan conducted a psychological evaluation for "DVR" related to the claimant's panic disorder with agoraphobia. He noted that she had recently reconciled with her husband. Dr. Morgan conducted a WAIS-R test, which showed the claimant had an average range of intellectual functioning. He also rated her global assessment of functioning (GAF) scores of "70" for the past year and the current year. A GAF score of "70" means the claimant had only some "mild" symptoms or some difficulty in social and

---

[1] The record indicates this state agency physician found Griego had a panic disorder **without** agoraphobia. Tr. 205, 212.

6

      occupational functioning.  Dr. Morgan noted the claimant had difficulty working because of constant standing.  He did not diagnose any psychological problems in his report, noting she had worked for the past five years at a casino and had worked in February 2000.  She did not quit working because of any emotional problems (Exhibit 14F, p. 6).

      In fact, Dr. Morgan wrote a letter to Dr. Cohen in April 2001 stating the claimant had panic attacks only twice a week (Exhibit 14F,p. 6).  In September 2001, Dr. Morgan recommended only "short-term" counseling for the claimant (Exhibit 14F, p. 5).  In February 2002, Dr. Morgan stated the claimant was not ready for employment because she was preparing for surgery.  However, Dr. Morgan did not identify the type of surgery that the claimant was contemplating (Exhibit 14F, p. 4).  Yet, in March 2002, Dr. Morgan stated the claimant would be a "good candidate for vocational rehabilitation" (Exhibit 14F, pp. 2-3).  Thus, Dr. Morgan did not think that the claimant  was unable to work because of her psychological symptoms.  Instead, he recommended that the claimant obtain some on-the-job training before returning to the work force.  He further stated that the claimant would not be "available for a work setting" until certain medical procedure were concluded (Exhibit 14F, p. 3).  Dr. Morgan diagnosed a panic disorder without agoraphobia (Exhibit 14F, pp. 19-27).

Tr. 12-18 (emphasis added).

      There is evidence in the record indicating Griego has suffered depression and anxiety and received treatment for these mental impairments.  On August 17, 2000, Griego went to Presbyterian Medical Group.  Tr. 222.  Griego complained of fatigue, decreased motivation, sadness, moodiness, decreased libido, and not sleeping well.  The health care provider diagnosed Griego with "Depression with Anxiety" and prescribed Paxil 20 mg every day.  On September 18, 2000, Griego returned to Presbyterian Medical Group for follow-up of her depression.  Tr. 221.  Griego reported she had separated from her husband, but they were discussing reconciliation.  Griego reported having problems sleeping and feeling empty.  The health care provider diagnosed Griego with acute depression and increased her Paxil from 20 mg to 40 mg. On October 2, 2000, Griego went to Presbyterian Medical Group.  Tr. 220.  Griego reported she had started psychotherapy with Deborah Okon, a clinical psychologist.  Notably, Griego <u>reported her</u>

depression had improved and she was sleeping better. Griego was taking Paxil 40 mg at that time. The health care provider directed Griego to continue the Paxil and the psychotherapy.

On April 13, 2001, Clifford O. Morgan, a psychologist, evaluated Griego. Tr.265. Dr. Clifford noted the New Mexico Division of Vocational Rehabilitation (DVR) had referred Griego. DVR requested Dr. Clifford perform a psychological evaluation to assess Griego's current functioning. She reported attending four months of therapy at Valencia Counseling in 2000 for depression. Griego also reported she attended therapy with Dr. Okon in Belen for two months and had taken Paxil for three months. She reported discontinuing the Paxil because it was not helping her panic attacks. However, she stated she started going to church and that helped her depression and anxiety. Dr. Morgan performed a Mental Status examination finding:

> Brenda described depression after the birth of her last child. She said this depression lasted until several months ago when the depression began to clear up. However, she disclosed panic attacks several times a week. She reports that she becomes triggered attending interviews or appointments. She also reports that she loses patience, and her anger is out of proportion to what is going on. During a panic attack, she trembles and she has a tight and heavy chest. She has feelings of being light headed and shortness of breath. She reports symptoms of a heart attack. Her panic attacks may last an hour or two or even a few days. She reports having panic attacks on and off since she was a teenager. She was not sure if she had been ever specifically treated for the panic attacks.
>
> On formal mental status examination, Brenda was oriented to time, place and person. Immediate and delayed recall were intact. Brenda had no difficulty with attention items such as doing Serial 7's from 100 or spelling a simple word backwards. She was able to tell time and demonstrate the use of money. Brenda was also able to follow simple verbal and written instructions. Reading level (high school) was adequate for questionnaires. Brenda was able to copy an overlaid geometric design. When asked to write a simple sentence, she printed. "Write something out."

Tr. 262 (emphasis added). Dr. Morgan administered the Wechsler Adult Intelligence Scale– III and the Wechsler Individual Achievement Test. Dr. Morgan found Griego's general intelligence fell within the average range when compared with her age group. As to her emotional status, Dr. Morgan noted:

> **Emotional Status**
> Brenda's depression was classified within the <u>Mild Range for Depressive Symptoms</u> on the Inventory to Diagnose Depression. However, Brenda reports that <u>her depression has been worse in the past and has improved within the last month</u>.
>
> Brenda completed the Battery for Health Improvement (BHI). The BHI was normed on a group of physically injured workers. The BHI reports Psychological, Environmental and Physical Factors which may impact her rehabilitation services. <u>Brenda did not report Psychological, Environmental or Physical Factors as current problems</u>. In addition, she had a high Perseverance score which suggests that Brenda should follow through on rehabilitation assignments. Brenda's pain complaints were focused on her lower back, legs or feet. She reported mild pain in neck or shoulders and chest. <u>Her overall highest level of pain has been a 4</u>. Thus, although Brenda does report pain, <u>she reports very little psychological stress secondary to this pain</u>.
>
> On the Incomplete Sentence Blank, Brenda reported stress over her anxiety. Brenda's oriented toward her family, and <u>her recent reconciliation appears to make her feel good about herself</u>. <u>Brenda appears to have a very optimistic outlook on her future</u>.

Tr. 263-264 (emphasis added).

**Dr. Morgan noted Griego reported feeling comfortable working alone or with people**. Tr. 264. Dr. Morgan recommended Griego seek short term counseling to address her panic attacks and opined she had the ability to be trained in a job which would involve less standing. Dr. Morgan diagnosed Griego with Panic Disorder without Agoraphobia. Tr. 265. Dr. Morgan assigned Griego a GAF score of 70 for the past year and currently.[2] A GAF score of 70 indicates **some mild symptoms** (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). DSM-IV-TR at 34.

---

[2] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR). The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.). DSM-IV-TR at 34.

On April 17, 2001, Dr. Morgan sent Dr. Cohen a letter requesting he evaluate Griego for medication for her panic attacks. Tr. 245. Dr. Morgan informed Dr. Cohen that Griego was <u>currently having panic attacks twice per week</u> and had been treated in the past with Paxil. Dr. Morgan reported the Paxil had not been effective in resolving Griego's panic attacks.

On September 18, 2001, Dr. Morgan submitted "an initial progress report" on Griego's therapy to DVR. Tr. 244. Dr. Morgan informed DVR he had started short-term counseling to address her panic attacks, depression and chronic pain management. Griego's first session with Dr. Morgan was on September 12, 2001. Dr. Morgan also informed DVR Griego would be attending a chronic pain management group.

On May 8, 2001, Griego submitted a "Disability Report– Adult" and noted she had gone to Presbyterian for "Depression/Anxiety due to disfunction (sic) in Marriage." Tr. 75. Griego indicated her first appointment had been on August 2000, and she her last appointment had been on February 2001. Under "Next Appointment," Griego noted "unknown." *Id.* On the same form, under Section 5– Medications, Griego indicated she was taking Xanax 5 mg for depression and anxiety. Tr. 78. Xanax is indicated for the treatment of anxiety disorder, the short-term relief of symptoms of anxiety, and panic disorder with or without agoraphobia. *Physician's Desk Reference* 2517 (53rd ed. 1999).

On the same day, Griego completed a Daily Activities Questionnaire and noted she had been changed from Paxil, an antidepressant, to Xanax. Tr. 84. In her Daily Activities Questionnaire, Griego noted she (1) did not have any problems getting along with family, friends, neighbors; (2) got along well with people in authority; (3) did not have any difficulty when she went out in public; (4) was able to start and complete projects or activities; (5) did not have

trouble following instructions or carrying them out; (6) did not have problems dealing with changes; (7) did not have trouble getting along with supervisors and/or coworkers; and (8) was able to accept changes at work that affected her job. Tr. 83-84.

On August 30, 2001, Griego completed another Daily Activities Questionnaire. Tr. 90-95. Griego described her day as getting her son ready for school, caring for her other two children throughout the day, cooking all the meals of the day, cleaning, washing dishes, vacuuming, fixing the beds, and shopping when needed. Tr. 90-91. Significantly, Griego noted in the questionnaire, "I have no problem with people in authority. I'm an easy going person who gets along with people well." Tr. 92. Again, Griego noted she did not have any difficulty when she went out in public (Tr. 92), was able to plan her day (Tr. 93), was used too change but did have problems while she was separated from her husband (Tr. 93), was able to make decision (Tr. 93), was able to concentrate when she worked (Tr. 94); and had no problems getting along with supervisors and coworkers (Tr. 94). At that time, Griego noted, "As for my last employer, they (sic) were aware of my depression due to split w/spouse." Tr. 94.

On October 11, 2001, an agency non-examining consultant completed a Residual Functional Capacity Assessment– Mental form (MRFC). Tr. 188-191. The consultant opined Griego <u>was not significantly limited</u> in (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction; and (4) adaptation. Tr. 188-189. Under Social Interaction, the consultant opined Griego was "<u>not significantly limited</u>" and "moderately limited" in her ability to interact appropriately with the general public and under Adaptation, "moderately limited" in her ability to respond appropriately to changes in the work setting. Tr. 189.

On the same day, the agency consultant completed a Psychiatric Review Technique form. Tr. 200-213.  Because the consultant found Griego's depression was not "severe," he evaluated Griego only for Listing 12.06, Anxiety-Related Disorders.  Tr. 200.  Under this listing, the consultant noted Griego suffered from <u>Panic Disorder without Agoraphobia</u>.  Tr.205.  Under the "B" Criteria of the Listings, the consultant opined Griego was **mildly restricted** (1) in her activities of daily living; (2) in maintaining social functioning; and (3) in maintaining concentration, persistence or pace.  The regulations direct that, if these three functional areas are rated as "none" or "mild," the ALJ may "conclude that [the claimant's] impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities."  *See* 20 C.F.R. § 1520a(d)(1), 416.920a(d)(1). The consultant included the following statement:

> Psych Allegations/Dx: Depression, Anxiety, <u>Panic Disorder without Agoraphobia</u>
> Client alleges depression and anxiety resulting from marriage dysfunction.  A psychological evaluation was administered, April 2001, an assessment which included both WAIS-III and WRAT Achievement Testing: the former yielding IQ scores in the average range: the latter indicating reading and writing skills somewhat above the 12th grade level. Client at his evaluation indicated <u>extent of depression had lessened</u>, but that panic attacks were occurring as much as several times per week; panic attacks triggered by employment interviews and appointments.  (It should be noted that in 8/30/01 DAR Questionnaire, <u>individual indicated no difficulty in social situations; has no difficulty being in public, and is able to relate to people in "authority" types of situations</u>.  On MSE, client was <u>fully oriented; short-term memory function was intact; and abilities to concentrate and be attentive revealed no apparent deficits</u>.  Additional medical evidence indicates that client's psychotropic medication regimen has been altered from 40 mg of Paxil to 5 mg of Xanax. In summation, while panic disorder may well be at least in part resolved with obtaining employment client is physically able to manage.  It is felt that panic disorder at this point in time is more than non-severe.  Specific limitations are noted on MRFC.

Tr. 212 (emphasis added).

On November 5, 2001, Dr. Santos, a Physical Medicine and Rehabilitation specialist with New Mexico Spine, evaluated Griego for neck, low back and bilateral leg numbness.  Tr. 280-

12

284. On that day, Griego **denied depression or "being down in the dumps**." Tr. 282. The only medications Griego reported taking at that time were Flexeril (muscle relaxant) and Feldene (nonsteroidal anti-inflammatory drug). Tr. 281.

On February 20, 2002, at Griego's request, Dr. Morgan provided her a "To Whom it May Concern" letter. Tr. 243. In the letter, Dr. Morgan indicated Griego was involved in a vocational rehabilitation program. Dr. Morgan opined Griego was not ready for employment because she was in the process of preparing for surgery. However, he opined she would be ready for employment following medical and psychological services.

On March 18, 2002, Dr. Morgan sent DVR a progress report. Tr. 241. Dr. Morgan indicated Griego had her first therapy appointment on September 12, 2001. Dr. Morgan informed DVR he had identified Griego's anxiety as Posttraumatic Stress Disorder (PTSD) secondary to childhood trauma. Dr. Morgan indicated he and Griego had been working on her anxiety by attempting to resolve her childhood issues. Dr. Morgan noted her medications now included Lorazepam (indicated for the treatment of anxiety disorders), Flexeril, and an arthritis medication. Dr. Morgan noted Griego continued to have stressors at home due to her husband losing his job and the family going on AFDC. Despite all of Griego's problems, Dr. Morgan opined <u>Griego was a good candidate for vocational rehabilitation</u>.

On March 28, 2002, Griego went to Presbyterian Medical Group for a follow-up of her panic attacks. Tr. 308. Griego reported she was taking Lorazepam for the panic attacks. The health care provider diagnosed her with anxiety and allergic rhinitis.

The Court has carefully reviewed the record and finds that substantial evidence supports the ALJ's finding that the evidence did not establish that her depression had a significant effect on

her ability to work. Therefore, the ALJ properly found Griego's depression was not a "severe" mental impairment at step two of the sequential evaluation process. *See, Cainglit v. Barnhart*, 85 Fed.Appx. 71, 73 (10th Cir. Dec. 17, 2003)(finding ALJ properly found claimant's depression did not significantly limit her ability to work even though she twice received low GAF scores of 45 and 30 where the evidence indicated her depression did not impair her intellectual functioning, she had a good work history and she was able to live independently); *Branum v. Barnhart*, No. 03-7105, 2004 WL 1752411 (10th Cir. August 6, 2004)(finding ALJ properly found claimant did not suffer from a severe mental impairment (depression) where claimant had no limitations with respect to activities of daily living, slight impairment with respect to concentration, persistence, or pace, and no history of decompensation).

The fact that Griego had at one time been treated with antidepressants was one of many factors the ALJ considered. The ALJ also properly considered the length of treatment, the severity of Griego's depressive symptoms, and their effect on her ability to do work. For example, the ALJ considered, *inter alia*, the April 13, 2001 Inventory to Diagnose Depression which indicated Griego was in the **mild** range for depressive symptoms. The ALJ also considered that by November 5, 2001, Griego reported **no depression** or "being down in the dumps." The ALJ also found it significant that Dr. Morgan opined Griego had only experienced **mild symptoms** the past and current year as evidenced by the GAF score of 70 that he assigned her and also **opined she could work**.

### B.  Residual Functional Capacity Determination

Residual functional capacity (RFC) is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of

jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c). In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion. See SSR 96-8p, 1996 WL 374184, at *7. The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.*

Griego contends the ALJ's findings that she is can perform a limited range of light work, with no prolonged walking or standing is not supported by the evidence and is contrary to law. Based on his RFC determination, the ALJ found Griego could return to her past work as a casino dealer. However, Griego contends she "testified that her job as a dealer caused her feet to swell and cramp, and hurt her back." Pl.'s Mem. in Supp. at 7. Additionally, Griego contends "[t]he VE (vocational expert) testified that a person who suffers from panic attacks would have difficulty performing a job that requires dealing with the public, and that all [her] past relevant work requires dealing with the public." *Id.* at 7.

The ALJ did not find Griego's testimony credible and thus did not consider or include in his hypothetical her claim that her feet swelled and cramped and her back hurt when she worked as a card dealer. *See, Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990)(an ALJ is bound only by vocational testimony regarding impairments he has accepted as true). The evidence does

not support Griego's claim. Dr. McCutcheon, an orthopedic spine specialist, evaluated Griego in 1991 and again on December 31, 2001. Tr. 290-294. Dr. McCutcheon is a member of New Mexico Spine where Dr. Santos also practices. Both physicians have treated Griego for her back and leg complaints. Dr. McCutcheon's December 31, 2001 evaluation is extensive. In his evaluation, Dr. McCutcheon noted that Griego had claimed (1) "that sitting, standing or lying increase[d] her pain walking after two days of such activity;" and (2) that she could "stand 30 minutes, sit 30 minutes and walk one-half mile." Tr. 290. After a thorough physical examination (Tr. 291-292), Dr. McCutcheon opined "[a]s she presents today, she does not qualify for disability." Tr. 292. Dr. McCutcheon indicated "[t]he prognosis for continued spontaneous recovery is fair." *Id.* Dr. McCutcheon recommended a formal program of physical therapy since she had not had one in the past. *Id.* The ALJ properly relied on Griego's treating physicians' opinions.

Although the VE testified that a person who suffers from panic attacks would have difficulty performing a job that requires dealing with the public, this was in response to Griego's counsel's questioning. The record indicates that Dr. Morgan never restricted Griego from working due to her panic disorder. Significantly, Griego reported she had suffered from panic attacks since she was a teenager. Tr. 262 (Dr. Morgan's evaluation– "She reports having panic attacks on and off since she was a teenager."). Yet, Griego successfully worked as a card dealer for many years and never claimed that panic attacks caused her to leave any of her jobs. Additionally, in her Activities of Daily Living Questionnaire, Griego reported she had no difficulties dealing with the public, coworkers or supervisors. Tr. 83. Dr. Morgan evaluation and

his clinical notes also do not support this claim. Accordingly, the ALJ properly rejected this factor based on his credibility assessment and the medical records.

### C.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence. *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility. *Id.* The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility. *Id.*

The ALJ considered Griego's testimony, her activities of daily living, his personal observations at the hearing, and the medical record and found Griego not credible. The ALJ also noted Griego had reported that she left her last job because she was fired not due to health problems. The ALJ set forth the specific evidence he relied on in evaluating Griego's credibility. The Court finds that the ALJ's credibility determination is supported by substantial evidence and will not be disturbed.

### D.  Conclusion

The Court's role is to review the record to ensure the ALJ's decision is supported by substantial evidence and that the law has been properly applied. After such review, the Court is satisfied that substantial evidence supports the ALJ's RFC determination, credibility

determination, and finding that Griego is not disabled.  The Court further finds that the ALJ did not err in finding Griego's depression "not severe" at step two of the sequential evaluation process.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.


                                              _____
                                              **DON J. SVET**
                                              **UNITED STATES MAGISTRATE JUDGE**